We welcome you here today. We have a couple of interesting different type of cases. We hope you will observe our time limits, which are clearly indicated in the signal light up on the podium. If the yellow light comes on, you have two minutes left. When the red light signals, we ask that you conclude your argument unless you are answering a question from the court. Also, we have read your briefs and record excerpts, but we have not necessarily read the whole record, so we appreciate citations when those are apt. First case of the morning is No. 22-40031, Spring Branch Wildlife Preserve v. EPA. Mr. Hoopman. I represent the two appellants in this case, which are two landowners and builders, and there is a whole series of details that are spelled out in the record excerpts of these communications between my clients and the Corps. There is a memorandum that the Corps and the EPA made amongst themselves. Obviously, I won't take the time to read through all of that, but there is detail in there that is crucial to the outcome of this case because the Bennett standards that apply to determine if there is final agency action turn on what those documents say, but they culminate in these cease and desist letters, orders that were sent out to my client. The government, or the EPA and the Corps, throughout those series of documents took the position that these lands in question were wetlands. There is a distinction in the Corps regulations where they say, it is a definition, you have approved jurisdictional determinations, and then you have the definition of what a jurisdictional determination is. Then you have the federal law, which is Bennett, that says whatever agency action is final. Here, there are two questions of what was final. One was whether or not these jurisdictional determinations were final agency action or not. It is my position that when you look at the history of all of the documents together, because you can't take communications out of context, you have to put it all together, it is clear that the government had determined that these properties were wetlands, and therefore they have a Clean Water Act jurisdiction over the property. Certainly at the time that those cease and desist letters were sent, they had determined that they were wetlands. You would think that was an implicit finding. You wouldn't order the dredge or whatever it was, the fill, to stop unless you thought you had control over it. Exactly. But also you have explicit findings throughout. Well, now, I don't agree with you there. I read the earlier statements from EPA saying that we have not yet determined, give us more information. But they mix that in the context of all these other statements, and it's clear that they have made these determinations, and there actually are formal, approved jurisdictional determinations that were made earlier on that regard in this exact same property. What formal? Are those approved, AJDs, Approved Jurisdictional Determinations? Yeah, those occurred on . . . Not your clients. That's on the same property. But those were back on March the 26th of 2018, which is Record Excerpt 9. You're talking something to Surfside Beach? I'm sorry? Okay, who was the recipient of that? One of those was the city of Freeport. Freeport, yeah. Right, and that was on an easement that runs alongside the property, and where culverts are put in to access this property in question. And then there was also a . . . Would it help to go through the specific documents, just so we can get real granular here? To deny? Yeah, I wasn't going to go through the details. No, I'm saying would it help, because you have to prove final agency action, right? Right. So what is the document? It sounds like you want to start with the March 26, 2018 document. Well, that's where they actually made a formal Approved Jurisdictional Determination. Okay, and you're saying that that's an addition of a final agency action? I think that you have to take the entire history of how all these communications went down to . . . No, that's fine. I heard your contextual historical argument. I'm fine with that. But we obviously need the action, so I assume the action under your theory is reduced to a document? Not only . . . yeah, it's the cease and desist letters. Right, so which is the document that you're focused on? Is it this document or another document? Your microphone is really weird. You know, I apologize. I'm curious which document or documents you think are the final agency action, because I want to talk to you about the text of those documents. Well, I actually think they all are, because of the way that the core regulations define what a jurisdictional determination is. So as I read . . . okay, so let's look at it. Do you want to start with the March 26 or a different document? I think the most important document for me is ultimately the cease and desist orders. Okay, so what's the record set on that? Those occurred on Record Excerpt 16 and then Record Excerpt 17. And those were on February the 4th and May the 20th. Of 2020, right? Right, right. And so in those letters, okay, one of them was sent to both of my clients, Spring Branch Wildlife Preserve and Houston Land Cattle. And then the next one was sent to just Spring Branch Wildlife Preserve. But they both stated very clear, just any person that's out in the field receiving these communications from the government is going to get the drift that if I do anything else on this property . . . because my client was running heavy equipment out there, right? And so these letters, when you get these letters, it's clear that if they do anything else on this property, there's something really bad that's going to happen, because they say so in the letters themselves. Well, the brief says they may not do anything. But what I don't quite understand, though, is that your clients have been interacting with EPA for nearly 10 years. Why didn't they just go through the process and request an AJD, document it and all that? Okay, the government makes a big distinction in their brief about an AJD, which is an approved jurisdictional . . . versus a JD. But if you look at their actual administrative rule, it's the same thing. Okay, they're saying that you have to get an approved jurisdictional delineation. It's by definition, it comes out of their section 33 CFR 331.2. That says . . . that's their coming up on their own, a rule to say what an AJD is. And they say in that rule that an approved jurisdictional delineation is appealable. Okay, but there's also a definition in that same section that says what a jurisdictional determination is. So, I actually don't think that the distinction, AJD versus jurisdictional determination, is dispositive in this case. Then it is dispositive. It's whether or not their actions are such that they've actually decided the crucial issue in this case. Well, you're not answering my question, though, because they sent your clients a letter, I think around 2018 or something . . . Right. . . . that said, we are rejecting your request for approval under the national permit, because we don't have enough information. That's regarding Spring Branch Wildlife Reserve. Okay, fine. And the client didn't undertake any effort to provide more information, right? It just sat there, or it started filling. It sent a notice of construction, actually. Right. He sent that pre-construction notification, and they didn't respond after 45 days, which under the nationwide permit, it's automatic. If they don't respond in 45 days, that means they've accepted it and they can start construction, per the terms of the nationwide permit. But, they never approved your guy under the nationwide permit. But, they don't have to under the permit itself. If you send that, the purpose of the pre-construction notice is to notify the government that we believe that our property falls under the nationwide permit. If they don't respond within 40 days, then they've conceded to it. That's what their own permit says. So, he sent out, on behalf of that particular client, the pre-construction notice and then amended it. The government didn't respond, so he started doing all the work out there. And then, apparently, the government thought that the two clients and the two different separate pieces of land were the same thing, because they sent out the cease and desist notice to both of them. And, they're completely different pieces of property and different issues. But, as far as you're trying to ask why he didn't do anything else, he had this long history of doing all this stuff with everybody. And, they've clearly taken these positions repeatedly that they think it's wetlands. His position, our position, is that the Clean Water Act, you can't regulate it because wetlands. It's debatable whether or not wetlands are even an affable water source. Well, and that leads into the obvious next question, which is, will this pending Supreme Court case have any impact on your appeal? It could have a huge impact on it. Why? Because, well, if the U.S. Supreme Court goes the way we think they're going to go, but what do I know, then they're going to say that the wetlands are no longer under the Clean Water Act. If they say the wetlands are no longer under the Clean Water Act, they've basically agreed to what we're trying to say. Is your wetland contiguous to the Gulf? No. It's our position that it's not. But, we believe that if it goes where it looks like it's going to go, then this whole debate that's been going on a long time in all these different appellate opinions, Sackett and Hawkins, etc., they're going to say that the Clean Water Act does not reach to wetlands. So, if it doesn't reach to wetlands, because wetlands are not, you know, not the waters of the United States, then we win our underlying arguments. So, we never got to our underlying substantive arguments because the court— Well, let me just suggest this. Apropos of what Judge Ho was pointing out, we need to know, in order to have jurisdiction here, we need to know what is the final order of the EPA. I mean, you have to be very specific about that, because otherwise we have to dismiss. Right. Okay, well, I believe the final agency action is two things. One, with respect to both clients, that they, being the EPA and the court, decided that they made a jurisdictional determination. Namely, these are wetlands that they can regulate, which gives them Clean Water Act jurisdiction. Okay? And they've done that through the cease and desist letters. And all the history beforehand. So, again, we're talking about the February 4th, 2020 letter. Your microphone is too small. Sorry, I apologize. We're talking about the February 4th, 2020 letter from the Department of the Army to Mr. Teddall. Yes. This is the final agency action. Yes. Did you challenge that in the district court as the agency action? They say in their briefs that I didn't challenge all kinds of stuff, but I've reread my petition over here in New York, so I think we challenged it repeatedly. And also . . . Do you have a site so we can make sure of that? In the complaint, the second amended complaint. I don't have the record set on that, but it's my second amended complaint. And also, we made the, to me, important argument, and I think it's supported by the Bennett case and other cases, including Fifth Circuit cases that apply Bennett, that you've got to look at the whole history of what happened to determine if it's final agency action or not. If they say in whatever their document is, for example, their own regulatory rule, approved jurisdictional determination, in that rule itself they say that is a final appealable action. But if you look at the second case, or maybe it was Hogg, they were arguing in that case that an AJD is not appealable. Okay, so it was the Hogg's case. And so, you know, in that case they have their own rule that says it's appealable, but they're saying that it's not appealable. Of course, the High Court disagreed with that, and then it ended up back in the trial court to make these factual determinations. But it does not have to be branded as an AJD to be final agency action. A memorandum can be final agency action. The government cites Texas versus Biden for the proposition that a memorandum cannot be final agency action. And the U.S. Supreme Court just recently, I think it was in June, came down with the Biden case saying that a memorandum can be final agency action if it's clear that the two elements of Bennett have come down. You know, if it fits that. So it doesn't have to be branded as an approved jurisdictional determination. It just has to be a jurisdictional determination, which they've clearly made throughout, and it's culminated in these cease and desist letters. And so you look at the cease and desist letters themselves show that they've clearly decided that, you know, these are wetlands and we can regulate them. What does the APA define as a final agency action? That definition is a 33 CFR 331.2. And basically any core document, any core or APA document that says that, and it can refer to a map. It says right in there it can be a map. Any core document stating the presence or absence of water of the United States ought to parcel or a written statement and map. And so, and that's what an approved jurisdictional determination is. Then they have a definition right under that of what a jurisdictional determination is, and it basically repeats that, and it gives a lot of examples. So it can be anything, anything that's in their documents. For example, the memorandum that the government makes a lot of hay about, that we've cited too, and that's, it says all in there, these are wetlands, wetlands, wetlands. And that is located at? Well, let me just, okay. What I asked you was whether the, how the Administrative Procedure Act is operative here. And under Bennett v. Speer, it's a two-part test. First, the action must mark the consummation of the agency decision-making process. Second, it must be one by which rights or obligations have been determined or from which legal consequences will flow. Now, you know, between Bennett and Hawk, and it seems to me arguable, because it seems to me that even while EPA issued a cease-and-desist order, it also said, come talk to us about this, right? And your client has declined those opportunities, similar ones being offered in all the other preceding correspondence. Sackett speaks directly on that point, okay? Well, in Sackett, as you know, the petitioners were liable for something like a $1,000 a day penalty. Right, if you look at the cease-and-desist letters here, it says basically the same thing, that we're going to get you in all these ways, money, et cetera. No, that's the Army Corps referring something to the EPA, and it's the EPA that takes action, right? Yes, but that's the referral letter. There's a referral letter where the Corps referred it to the EPA, and then there's the cease-and-desist from the Corps, and then also from the EPA laying out. They're telling them straight up, you better stop, or all this stuff is going to happen. Now, true, they put in this maybe at one point, but when you read the whole letters in context, it's clear that it's not a maybe. Also, when you look at the history, it goes way back, again, through these documents attached to these record exhibits, they've repeatedly said that they're wetlands. Once they say they're wetlands, they're asserting Clean Water Act jurisdiction, and that's the final action right there, the final agency action. When you come back, I'd like to talk to you about page 11 of your Second Amendment complaint, because I'm not seeing you challenging the document you're challenging today. Okay. Thank you. I wasn't trying to dismiss it. Are you done? Okay, all right. Done deal. Ms. Katsilas? Good morning, and may it please the Court. My name is Anna Katsilas, and I represent the federal defendants at Belize. As your honors have alluded, there are two administrative processes, separate administrative paths that plaintiffs could have but did not pursue to obtain a final agency action reviewable under the Administrative Procedure Act. The first path is to request an approved jurisdictional determination from the Corps of Engineers. That did not happen here, and it is important to clarify that while plaintiffs have labeled documents as approved jurisdictional determinations, they have not challenged one and did not request one in connection with their project. They took an early preliminary step of asking the Corps to verify that their project could proceed under two nationwide permits. That essentially would have given them a fast track. If the project appeared on their paperwork to meet the terms and conditions, that would have given them a fast track. But when the Corps could not verify that their project met the terms and conditions— How was it? Did the Corps do anything to verify, or is it the entire burden on the petitioner to present hydrological reports and surveys and photos and all that kind of stuff? This is a very early preliminary stage, and the Corps reviews essentially the paperwork that the plaintiff provides. Does the Corps ever approve immediately a request for one of the fast tracks? I believe that it does. I don't have an example, but I believe that it does. You can look at the no verifications, and the record sites for those are actually ROA-135. It's ROA-129 and 133-34, but it was clear from the information, and especially the second one, 133-34, there were two problems with the paperwork that plaintiffs submitted. One is that a project to be verified under a nationwide permit needs to be a single and complete project. What plaintiffs were attempting to do was to get verification that they could do a utility right-of-way under one permit, under one nationwide permit, and construct an access road under a second permit. That doesn't work. For a nationwide permit to apply, there needs to be a single and complete project. You can't do this piecemeal approach. Then the other problem is General Condition 28, which is the maximum threshold of impact. They submitted their own report that their consultant had prepared, stating that 1.05 acres of wetlands would be lost. That exceeds the 0.5 acre limit. At that part in the process, the Corps advised the plaintiffs to apply for an individual permit, but rather than do so, they abandoned the administrative process and they commenced construction. They abandoned the permit process. The other process they could have pursued but did not was to request an approved jurisdictional determination. The Corps does these for free, but they didn't ask for that here. They didn't obtain one. I want to be very clear that neither of those things are in the record. If you look at all of the documents that plaintiffs have identified, none of them is an approved jurisdictional determination. Let me ask you, Counsel, the referral letter of May 2020 refers to a memorandum of understanding between the Corps and the EPA. Hawks talks about jurisdictional determinations as the final action of either the Corps or the EPA. I don't know what's in the memorandum of understanding, but it does seem to me that at least the May 2020 letter, maybe the February 2020 letter, are saying the Corps is done with this, that we are referring to this. In our memorandum, the EPA has agreed to accept. I guess it's discretionary in some way under the memorandum. We agreed to accept. What further is there for the Corps to do, at least insofar as whether their action is final? Looking at it, not just two years later, looking at it in terms of May 2020, what further involvement would the Corps have had? What further decision-making would the Corps have had? The Corps, again, if the plaintiffs had pursued either path, either would have issued an approved jurisdictional determination or a permit decision. Either of those would have been administratively appealable, and then that decision would be judicially reviewable, but they abandoned that process. Then what happened is the Corps referred this to EPA for possible enforcement, but there is no culmination. Plaintiffs could have pursued either of those paths. Those are separate administrative paths. What we're looking at is what is final. I'm asking a more limited question, perhaps, than you're answering. Is the action of the Corps here final as reflected in the May 2020 letter? It is not final, Your Honor, respectfully, because this is, as we've explained in our brief, the Corps doesn't have the enforcement authority that EPA has. The Corps has simply referred this matter for EPA to— Does that mean the Corps is never a final agency action in these settings? The two possibilities for the Corps are approved jurisdictional determinations and permit decisions. On the enforcement side here, this would have to come from EPA. This would have to be something that—and EPA has not culminated the enforcement process. This is where the first SACCET decision is very helpful because that case involves an administrative compliance order. EPA has not issued an administrative compliance order in this case. What about this cease and desist? Also, it's very important. There is no cease and desist order in this case. It says cease and—please cease and desist. What does that mean? There is no order. There is nothing akin to an order imposing penalties or anything like that. Well, this seems to me like an agency subterfuge, frankly. We're telling you you better cease and desist, but you can talk to us. Maybe we'll think about it, but in the meantime, cease and desist. But this isn't an order. Respectfully, Your Honor, I disagree, and we disagree because what— You concede the word cease and desist appears February 4, 2020. I concede it. To most American citizens reading English, they would regard this literally as a cease and desist. Tell me why that's wrong. What these documents do, and these documents are within—we've explained in our brief, there's well-established law that an agency's expression of its opinion of how the law applies to particular facts in a particular party is not final agency action, even when the agency's view is adverse to that party. These are intended to be helpful. It is helpful—it is better that the plaintiffs know that the Corps believes that these are wetlands and a permit is required for this project at an early stage of the process so that— and if you look at all of these documents, Your Honor, they all ask the plaintiffs to contact the Corps, contact EPA. But the first sentence of the May 20th letter, I think there's a question about preservation on the February one, the EPA has recently received an enforcement case referral from the Galveston District Army Corps regarding the above-referenced violations. Well, I mean, if a policeman is reporting to the DA about driving under the influence, you don't take that as nothing's going to happen. That indicates violations and referral, and then it refers to minimizing damages. It reflects that EPA is investigating the matter. It does not reflect any final decision by EPA. There's no action. What I was getting to earlier, it seems to me the Corps has made its decision. Now, you're saying there are other things that could have happened while the Corps still had it. Those avenues weren't taken. So it seems to me the Corps has made its final decision based on the processes that it has and that were pursued by the other side, and now have turned it over to the Corps to pursue the violations. I mean, I wouldn't go maybe quite as far as some of the language that Jones just used about— I forget what it was, subterfuge or whatever, but it does seem to me that when you look at HAWQS, and it talks in part about the risk, you need final agency action, but it also needs to be putting the private party at risk. Parties need not await enforcement proceedings before challenging final agency action, and I'm wondering if the Corps' action isn't final, where such proceedings carry the risk of serious criminal and civil penalties. And this May 20 letter is talking about that very thing for a violation, not for a possible, not for one we're going to explore. I know you think we're ignoring the—not us, necessarily me— ignoring how you see this whole scheme, procedure set up, but just looking at it in terms of HAWQS and what is final agency action, and to use Judge Ho's formulation, tell me why it's wrong for me to see this as final action by the Corps, a violation is going on out there by the placing of this field. If you put any more field dirt in this, you are risking, as HAWQS says, enforcement action against yourself. Why doesn't all that fit from their viewpoint? I think a very important point to take from HAWQS is that the approved jurisdictional determinations are binding on the Corps. There is a binding decision when the Corps issues an approved jurisdictional determination. It's binding on five years. That gives the person to whom it's issued, or the entity to whom it's issued, a safe harbor or denies a safe harbor. We don't have any of that here. We also appreciate that practical consequences may feel substantial, but they are not legal consequences. And to come to Bennett, and when you look at the HAWQS decision, you don't have either prong here. There is no consummation of the decision-making process, and HAWQS is very good about talking about the distinction between approved jurisdictional determinations and preliminary ones. In that administrative path, the approved jurisdictional determination is the culmination. We don't have that here. In the enforcement realm, SACID is talking about a different path, and we don't recommend that plaintiffs – there is no need for plaintiffs to wait for an enforcement case. There were paths they could have pursued and did not, but if a plaintiff goes that route, which these plaintiffs have chosen to do, they can raise any defense if there is ultimately an administrative compliance order, which there isn't here, but they could raise that. But again, there's the consummation of a decision-making process that hasn't happened, and there are no legal consequences. What EPA's letter indicates is that EPA is investigating this matter. It has been referred from EPA. But I think this Court's decision, we cited it in our brief. So if I may go back to what you said earlier, what are the steps that in your mind would create Article III jurisdiction? I'm sorry, final agency action. There are three possibilities, Your Honor. Okay. What are they? Three possibilities. Request an approved jurisdictional determination. Get an approved jurisdictional determination. Appeal it. Go to court. And you're saying they never formally asked you to finally determine jurisdiction? There is, no. That would have been on the core side. No. I'm sorry. No, they did not. They did not, but that would be from the core. Yes, that would be from the core. Your core, please tell me, are you saying you have jurisdiction? Just out of curiosity, what's to prevent the core from ignoring that request? I'm sorry. What's to prevent the core from ignoring the request for a final jurisdictional determination? Oh, I don't know that there's any indication or any suggestion that the core would ever do that. Well, Judge Jones suggested administrative subterfuge, and I'll confess I'm sympathetic to that. I mean, for a lot of landowners, this is a morass, and it's hard to figure out what they're supposed to do. So you're saying they can ask the core for a final jurisdictional determination? Yes. Tell me that you have determined that you have control over my property. Absolutely. What's to prevent the core from saying, thank you for your letter, we'll get back to you in five years? Well, Your Honor, I don't know. I can't speak to that, but there's no indication that that happened. There's no request here. This is not about this case. I'm asking about how, let's say you're right, stipulate hypothetically, what should they do tomorrow?  I'm not really hearing how they can do what's next. Actually, Your Honor, I just don't know exactly what to say to that. I don't think that there should be a presumption of regularity. The core is entitled to a presumption of regularity. But that's number one. The number two option was they could have applied for a permit. They could have applied for a permit. They stopped. You're saying they never did. They never did that either. And then the third option, which, of course, we don't recommend, but is what they appear to be doing, is to abandon both processes, build their, you know, commence construction, build their project, and then they can dispute core jurisdiction. They can dispute all of these things if there is ever an administrative compliance order or, you know, a case filed in court. So those are the three possibilities. We've got none here. So I think it just is very important. We really do ask that the court look at each of these documents because they are not what plaintiffs have represented them to be. In each of these, and, again, we understand that this language may be jarring to a plaintiff, but it is, again, it is generally helpful for agencies to tell regulated parties what its opinion of the application of the law to the facts is. This is where we are right now. What? This is where we are right now, we the agency. We're here. Get back to us if you think we're wrong. Let's talk. This is what we think. We recommend you contact us to resolve this matter. And in fairness to your position, in this May 20 letter we're talking about, you do describe this as an interim – not you, but the agency describes it as an interim protective measure. Correct. Correct. I mean, this is – EPA is, you know, is suggesting that they not – the plaintiffs not let this matter get worse, right, because EPA could, if it decides, require restoration of the property, et cetera, et cetera. It could get more expensive and more problematic for these plaintiffs if they continue to ignore the agencies. Would it – I'm sorry. Well, I'm just looking at Hawks here, and EPA made the same, or the Corps, made the same arguments. The Corps contends that respondents have two alternatives, either discharge film material without a permit, risking an EPA enforcement action, or apply for a permit and seek judicial review if dissatisfied. And then the Supreme Court says neither alternative is adequate, but isn't that – that's exactly what you're offering here? Well, I mean, the Court addressed that in Hawks, but importantly . . . That is Hawks. Yes, I know. Oh. Yes, I understand, Judge Jones. But, you know, the Supreme Court also went through the Bennett v. Speer prongs, and neither of those are met here. There is no consummation of the decision-making process. There's also no legal consequences. And that's a big distinction between this case and Hawks because there are – there's no safe harbor. There's no denial of a safe harbor. Nothing has been finally determined in this case in the matter. And I think it's important. Judge, you know, Hawks is an important issue. You're saying there's another defect in Hawks. I'm not saying there's a defect in Hawks. I guess my point is, isn't Judge Jones right, though, that your sort of proposed go-get-a-permit, the Supreme Court is making specifically the concern that we're talking about here, which is that that process can be arduous, expensive, and long, and so this alternative is not an adequate alternative.  But the court ultimately concludes that the Bennett v. Speer prongs are met. And the approved jurisdictional determination is distinguishable materially and importantly from every document plaintiffs have identified. Well, isn't this an applied, disapproved judicial determination? No. You don't even have that. There's no application you're on. Well, you didn't. But the court did not reject their request under the national permit on the grounds that it had not made a jurisdictional determination. It rejected it on substantive grounds that there was one acre rather than a half and you can't piecemeal. Again, how can you do that without an implicit determination that this particular parcel was covered by the Act? Well, I think, again, it's important that these are separate administrative processes. Approved jurisdictional determinations cover a property and there would be a determination. The nationwide permit is a permitting process. It's project-specific, and they didn't pursue either. But project-specific, the EPA or whoever it is can only grant authority under a nationwide permit if they have jurisdiction to begin with. Right? Yes. But, I mean, I think that plaintiffs submitted to the court their pre-construction notice that there are wetlands. No, I'm talking about back at the very beginning when they applied two times, if I'm not mistaken, for these nationwide permit 12, 14, and 19, and then they revised it to 12 and 14. And what I'm saying is the reason, which you stated, which was in your brief, for denying these permits were, A, too much acreage, and, B, you said you can't piecemeal these. And, again, you can't make those determinations unless you've already decided you have authority because otherwise the regulator would say, Oh, well, this isn't my bailiwick. Well, respectfully, Your Honor, I think... Or does EPA go about giving out permits even if they don't have jurisdiction? Respectfully, Your Honor, I think a couple of points that are important here is that this is not the kind of formality or the kind of formal determination that is reflected in an approved jurisdictional determination. It's nothing like that. The plaintiffs submitted paperwork to the Corps, and it said, We want to fill 1.05 acres of wetlands. And the Corps said, We can't verify that you can proceed under these permits. That's it. It says a little more than that. Just in fairness, it says to receive authorization for the proposed project, you must reapply under an individual permit. And then it refers to an Army Corps website. Correct. Why is Ditch Stone's not correct that that is an implicit jurisdictional finding? It doesn't have... It's not sort of the kind of finding that you had in Hawks. I understand it's not an express... The words jurisdiction don't appear here, at least I don't think they do. But it sort of puts the Army Corps in potentially bad light to say, We send letters all the time pushing people around, even though we don't have jurisdiction. Again, I think, if I may, Your Honor, it's important to make the point that this is a streamlining option. The nationwide permit process is an available fast track if a property owner can show that their project meets the terms and conditions. This is something the Corps is trying to do to lessen burden and to lessen expense. But if you don't get on the fast track, if the Corps... What happened in this case is plaintiffs submitted to the Corps papers that said, basically, we don't meet this requirement on its face, and the Corps... So you don't get the fast track, Your Honor. But this is not the conclusion of this process. Let me... I just want... Well, he could ask his question, but at the end, I want you to tell us what you think is the impact of the current Supreme Court case, and maybe we need to stay our hand until that's decided. Certainly, Your Honor. I think the Court definitely does not need to stay its hand in that case. So the 2012 Sackett decision is the one relevant to the question before the Court, which is jurisdiction. The current decision is... Or the current case before the Supreme Court is a merits question about whether a man-made barrier defeats adjacency between wetlands and traditional navigable water for purposes of the Clean Water Act. It's not implicated here at all. I mean, the merits aren't even teed up yet, but there's also no indication that there's any barrier of any kind. These are just straight up adjacent to a traditional navigable water. So the merits issue isn't relevant. We will note that the Court and EPA are currently working on a new rule defining waters of the United States, and they expect to come out with that by the end of the year. So if something happens in the future in this matter, if there's enforcement action or something, plaintiffs could possibly raise the decision that comes out, but it has no relevance for this Court. It's the jurisdictional question before the Court. Let me ask an extremely simplistic question about the Army Corps' jurisdiction. Does the Army Corps have jurisdiction over this property? Well, there's been no formal—it's not made any final decision on that. I can only answer based on what is in the record, and there is no—I would answer the question, yes, if the Corps had issued an approved jurisdictional determination, but it hasn't. Okay, so it is possible, in fact it sounds quite likely, that the Army Corps sends these letters in situations where, in fact, it would later admit it has no jurisdiction. If there is a permanent application that, you know, brings forward different information or it appears different, then there could be a different— I'm not necessarily suggesting it's untoward. I'm just asking the question. Yeah, there could be—I mean, again, and I think that— The Army Corps can make a mistake. Yeah, it highlights that this is just based on very limited— it's based on very limited paperwork provided by the plaintiff. The Corps hasn't done any fact-finding. The Corps hasn't done anything in this. So if tomorrow petitioners ask for a jurisdictional determination for the Corps to say that it does have jurisdiction, in which case I assume they will challenge it, or, you know what, our bad, we don't have jurisdiction after all, how will the Corps react to that request? Again, Your Honor, I think the Corps is entitled to a presumption of regularity and presumably— Oh, I'm giving you that presumption. I'm asking you in good faith. I am not an engineer, Your Honor, so they would go and do the site visit and do the work and prepare and approve jurisdictional determination. I can't speak to the findings, the technical findings. I'm sorry, let me be clear. I'm not asking you will they say yes or no. What I'm saying is how quickly—what is the response process? Fair enough. I don't mean for you to pin down right now what the jurisdictional answer is, but will they get one? That's a good question, Your Honor. I'm not sure how long it might take. Will it be less than six months? Well, just at the approved jurisdictional determinations in the record, the 2010 one that plaintiffs requested on August 16th and the Corps issued it on September 28th, so that's about a month. In the 2017 one, it looks like it took two months. Okay. I'm sorry, these are about different properties? Pardon, I didn't quite hear. Well, these are the ones that are not properly before the Court. They have referred to two approved jurisdictional determinations. This is different, right? Yeah, so I'm just— You're using this as an example? They show you that it took the Corps about one month and two months to issue. So in other words, just to make sure we have an agreement here, if they were to turn around and ask for this approved jurisdictional determination, one way or the other, I get that you don't know what the process will result in, but they should get a response within three months. I don't know of any reason they would not get a response. Thank you, Your Honor. All right. Thank you, ma'am. Mr. Hoopland? There's this Corps memorandum that we got access to after we filed this lawsuit. It's Record X or XII. This is just an example. Many examples through all these exhibits. They say the proposed private drive contains adjacent wetlands. And those kind of statements are throughout the record. And so at the very end, when the cease and desist orders come out or letters, like Your Honor Jones is saying, it's implied—I think it's actually overt, but it's certainly implied throughout that they've already made this. Did you timely offer this in the district court? They offered it. We didn't have it until after we filed the lawsuit. That's their internal memo. Did Judge Brown's decision refer to that? I don't remember specifically in his opinion, but it was talked about in the lower courts, and that was part of what came into the evidence. And my opponent here refers to the memo in her brief. I forget which page. I think it's page 33 of her brief. But she's arguing that memos cannot be final agency action. However, the U.S. Supreme Court just said that, yes, they can in the Texas v. Biden case. Okay, just quickly, I want to make also, to me, a real important point, that the U.S. Supreme Court and, I believe, the Fifth Circuit cases have said these jurisdictional determinations are a practical analysis. I asked you a question earlier. I don't think you got into it. You may want to address it. You have 90 seconds left. I don't know what your question is. I asked you about page 11. I got it right. Page 11, you're a second right. Where do you challenge this February 4, 2020 document that you're using today? With respect to the district court, the district court analyzed the four documents you said were final agency action. The district court said you did not identify this February 4. I didn't cite to that in my compliant. I did not cite to that February 4 letter in my compliant. There's two February 4 letters. Right. But I say the two— You acknowledge it's not in there. So the district court wasn't wrong. I acknowledge that the date is not in there. I think I have a typo in page 11 of my— because I cite the two cease and desist letters. And it looks like I got the date wrong. But everybody in the courtroom when we were dealing with this in the summary judgment or in the 12B motions were talking about the cease and desist letters. And I believe that's a typo in page 11. Everybody makes mistakes. That's fine. When you say you got the date wrong, are you referring to the EPA sent a cease and desist letter on May 20, 2020, and you meant to say February 4, 2020? Well, they sent—factually they sent one on May 20, and they sent one to both of my clients, a joint letter, on February 4. I sent it to a cease and desist on December 17, but there is no— there's a previous December 17 letter, but that's not a cease and desist letter. I'm sorry. Where do you see December 17? It's on page 11 of my complaint. It's also on— I'm looking at it. I don't see December. It's about two-thirds down on the right-hand side. Oh, I'm sorry. There it is. And that's— February 17, 2019. Okay, so you're saying that was a mistake because I have the December 17 letter. You're saying you meant February 4, 2020? I'm pretty sure that's what I did because all along this has been about cease and desist letters. You saw the district court opinion. Did you seek reconsideration there? Your microphone. Yeah, sorry. You saw the district court's opinion. Two opinions. When it came out. Oh, the one that we're talking about here. The district court talks about—does not talk about—talks about the problem that you didn't mention the February 4th. Did you seek reconsideration there? Do you want to seek reconsideration there? I believe—I thought I mentioned reconsider. Okay. I thought it was—I respect—I like the charges, but I just think it's— I didn't think it was too—obviously, I disagree with it. I thought that we clearly raised the cease and desist letters. I thought we clearly were saying, look, the court has made these jurisdictional determinations because they've decided it's a wetland. Do you acknowledge that it's a mistake? All right, well— Clearly. Clearly. I mean, this issue is briefed, so we have enough on it. Thank you very much. Thank you very much. All righty.